THOMSON METER CO. v. NATIONAL METER CO.

(Circuit Court, S. D. New York.   October 5, 1900.)

1. PATENTS—LIMITATION OF CLAIMS—SCOPE OF INVENTION.
    The doctrine that an inventor is entitled to the beneficial uses of his invention, although not disclosed by him in his patent, cannot be so extended as to embrace an independent invention of which he had no conception.
2. SAME—CONSTRUCTION OF CLAIMS.
    A specific statement of function inserted in a claim as material cannot be disregarded, and the claim does not cover the use of the same combination or elements to perform an entirely different function, and where they do not perform the function stated.
3. SAME—INFRINGEMENT—WATER METERS.
    The Thomson patent, No. 387,831, for a disk water meter, claim 2, does not cover an operative construction for holding the piston or disk in such a meter on its seat by water pressure alone, and is not infringed by a meter made in accordance with the Nash patent, No. 527,535, the essential feature of which is the control of the disk by the current without mechanical means.

In Equity.   Suit for infringement of patent.   On final hearing.

Edwin H. Brown, for complainant.
Gifford & Bull and Edmund Wetmore, for defendant.

TOWNSEND, District Judge.   Final hearing on bill and answer raising questions as to validity and infringement of the second claim of complainant's patent, No. 387,831, granted August 14, 1888, to John Thomson, for a disk water meter.   Said claim is as follows:

"In a water meter, the combination, with a disk chamber having a fixed diaphragm and an oscillating disk therein, of inlet and outlet ports formed in said chamber, the area and circumferential extent of the inlet port being greater than that of the outlet port, whereby the impact of the inflowing current upon the disk is decreased, substantially as set forth."

The patent relates to the class of rotary displacement water meters, in which a disk, called in the briefs and argument a "piston," so nutates or wabbles in a meter chamber as to measure the flow of water through the chamber.   The interior side wall of said chamber is in the form of the equatorial zone of a sphere.   Its top and bottom walls are in the form of truncated cones with the smaller ends adjacent.   On one side of said meter chamber a radial partition called a "diaphragm" extends from its top and bottom walls

between the center and side wall, and separates openings in said side wall known respectively as the "inlet port" and the "outlet port." The so-called piston of the meter is disk-shaped, and of such a diameter that it closely fits the side walls of the meter chamber. At its center it is provided with a ball to fit in bearings formed at the central portions of the top and bottom walls of the meter chamber. A radial slot in said disk, extending from the ball to the periphery of the disk, permits said disk to embrace or straddle said partition or diaphragm in the meter chamber. In operation the water enters the port on one side of the diaphragm, and circulates through the meter chamber, and flows out at the port on the other side of the diaphragm, and in so passing causes the disk to nutate or tilt progressively with a rolling action, but without possibility of rotation, because of its engagement with the diaphragm of the meter chamber. A spindle extends upwardly from the ball of the piston, through a circular aperture in the ball bearing in the top wall of the meter chamber, and by the nutation of the disk is caused to so revolve in contact with the edge of said aperture as to operate mechanism which registers the number of nutations made by the disk, and thus records the amount of water flowing through the meter. The issues herein are involved in another suit, as will be hereafter explained. There is no novelty in any of the patents forming the bases of either of these suits, with regard to the meter chamber, or the disk, or the registering mechanism, or the number of ports in the meter chamber; said features having appeared in earlier patents. It is only contended that the improvements in this suit consist in new constructions of ports in the meter chamber, in order to prevent the piston from being unseated, and thereby to preserve unbroken the line of contact between the piston and its conical top and bottom walls. If contact is broken, water will flow through the chamber without being measured. Both complainant and defendant are manufacturers of water meters, and are, and for a long period have been, rivals in business. The defendant is complainant in a suit for infringement of two of its patents against this complainant. The two cases were argued at the same session of court. The decision in the second case will be found in National Meter Co. v. Thomson Meter Co., 106 Fed. 531.

Prior to 1887 water meters of the disk or nutating piston type had been constructed, but they were not practically successful, because of a tendency to become unseated,—that is, to break contact between the piston and upper and lower walls of the meter chamber,—and to thus permit leakage. Thereupon Messrs. Thomson & Lambert, of the complainant company, and Mr. L. H. Nash, of the defendant company, addressed themselves to the task of devising a commercially successful meter in which the impact of the inflowing water should be so reduced that the piston would keep its seat. They undertook to solve the problem in different ways. As a result, Thomson & Lambert obtained patent No. 375,023, on December 20, 1887, and Nash obtained patent No. 379,805, on March 20, 1888. The patentee of the patent in suit, referring to the constructions covered by these earlier patents, truly says:

"In previous practice it has generally been presumed to be necessary that the inlet and outlet ports should be formed of equal (circumferential) area, and disposed in equal extent on either side of the diaphragm."

That is, they secured two ports of equal area and of the greatest possible aggregate area by so constructing them that their edges should conform to the edges of the piston when it was in its position of greatest elevation and depression. The aggregate opening was lune-shaped and was limited to 180 degrees in circumferential extent; each port being spherically triangular in shape, of maximum height, and with its apex furthest from the diaphragm. Both patentees stated that the object in thus making the ports as large as possible was to reduce the impact or velocity of the inflowing water. On this point Thomson & Lambert say:

"The first object of this peculiar arrangement and form of water ways and ports is to present the greatest possible area of opening to the disk chamber, the velocity of the current being thereby so greatly reduced that its dynamic effect upon the disk, ball, and socket is practically inappreciable."

Neither of these meters held the piston to its seat without the addition of some restraining contrivance. Thomson & Lambert used a roller on the spindle in conjunction with a fixed stud. Nash used a weight on the spindle, designed to hold the piston on its seat by centrifugal force.

It is essential to the successful practical operation of a water meter of this class that the piston shall constantly maintain contact with the conical heads of the piston chamber, with the minimum of resistance and friction, and that the maximum flow of water through the meter shall not be reduced. The roller and weight contrivances of Thomson & Lambert and the weight of Nash caused resistance and friction, which retarded the operation of the disk, and resulted in the wearing away of its edges, thereby shortening its life, causing it to leak, and impairing its accuracy and efficiency. The effect of reduction of impact is to permit more water to pass through the meter with less friction and strain. No construction would be permissible whereby the ports should be less in cross section than the supply and discharge pipes. The problems involved in these objections and requirements were still unsolved by these rival inventors. In 1888 Thomson set forth in the patent in suit, what is claimed to be his solution of these problems. Certain parts of the specification which relate to the invention in suit are as follows:

"The fourth object of the invention is to provide the greatest possible area for the inlet of the fluid to the disk chamber, thereby adapting a smaller size of meter than heretofore to greater duty. * * * In previous practice it has generally been presumed to be necessary that the inlet and outlet ports should be formed of equal area, and disposed in equal extent on either side of the diaphragm. I have found, however, that this is not necessary, and utilize this fact to provide an inlet port of greater area than that of the outlet port, as fully illustrated in the drawings. This is accomplished by extending the line of change in the disk from the center of the diaphragm around into the inlet port, as indicated by the broken line, 26. When the disk is in contact with the cone frusta at this section, the edges of the ports are lapped. In other words, it is at this portion of the motion of the disk that the change of displacement occurs from one side to the other thereof. To permit such a for-

mation of the inlet port, and at the same time prevent communication from one side to the other at the time of change, it is necessary to form the corners 27, 28, of the outlet port somewhat higher than that of the corresponding corners of the inlet port, and also that the contact of the disk on the diaphragm shall be made with approximate accuracy. The advantage of this construction is that the velocity of the inlet current upon the disk may thus be reduced to the greatest possible extent, as the area of the port may equal or even exceed the area of the passage through the disk chamber."

There is great conflict as to the object, scope, and. effect of this invention. It is admitted that Thomson thus disclosed for the first time the discovery that a further increase in the size of the inlet port and consequent reduction of impact could be secured by shifting the diaphragm from the center of the two equal ports over into the outlet port.

Counsel for complainant claims as follows:

(1) The theory of the invention covered by the claim in suit was to "constantly provide superior pressure upon the inlet side of the piston by making the inlet port larger in circumferential extent and area than the outlet port, * * * thereby holding the piston to its seat."

(2) The foregoing statement in the specification as to the fourth object of the invention must be construed to refer to the foregoing theory, because by reason of such construction "a greater duty, in the sense of higher speed with perfect measuring, will be performed by the meter.". .

(3) The statement that the result is to be accomplished by "extending the line of change * * * around into the inlet port" (that is, by shifting the diaphragm away from the central position around into the outlet port) "is only a description of the form illustrated in the drawing, and preferred because it permits of a maximum area of both ports." The "line of change" is an imaginary line. It is defined as. "the portion of the motion of the disk that the change of displacement secures from one side to the other." It is the line which marks the point where one chamber is at its maximum and the other is at its minimum size. The position of this line is constant. It does not change. It is agreed that the statement in the specification, "extending the line of change in the disk from the center of the diaphragm," means "the diaphragm is to be shifted from its central position."

(4) That is, complainant claims that Thomson's invention covered not merely the form of meter with shifted diaphragm specifically described and claimed, but "the method of providing an inlet port in area and circumferential extent greater than the outlet port, without shifting the diaphragm." This would cover a construction wherein the diaphragm remained stationary, but the apex of the outlet port furthest from the diaphragm was filled up, and it is this construction alone which defendant is alleged to have infringed. To support this contention, complainant relies on the following facts:

(a) Thomson's original sketch for. the patent in suit illustrates, inter alia, inlet ports greater in circumferential extent than outlet ports, but "not carried to their extreme theoretical or practical limit." As to this sketch Thomson testifies:

"I think this sketch tells its own story, the outlet port being smaller than the inlet; and such a construction in any disk meter could be obtained without shifting the diaphragm to one side or the other of what may be termed its mid or neutral position."

(b) At the close of the specification the following language is used:

"While I have thus described one embodiment of my invention, which is the preferred form, it will be evident to those skilled in the art that many of my improvements can be embodied in various other constructions without departing from the principles thereof. It will be also evident that various features set forth may be combined in a single structure, as shown, or may be used separately or in combination with other equivalent features; and my invention is not, therefore, limited to the precise construction and arrangement shown."

Counsel for complainant says:

"This comprises a clear statement that the raised corners, 27, 28, the shifted diaphragm, and the mechanical devices for holding the piston in position without tension need not be used with the differential construction of chamber ports."

(c) The third claim specifically covers the shifted diaphragm construction. Counsel for complainant therefore contends as to the second claim as follows:

"Based upon the specification, with its concluding suggestions of possible modifications, and contrasted with the third claim. this claim must be construed to broadly cover any meter of the nutating disk type having the inlet port of the meter chamber in area and in circumferential extent greater than the outlet port, and regardless of whether the ports are or are not as large as they would be made."

Complainant, in support of its contention that the claim in suit covers a construction whereby the piston is kept on its seat by water pressure, relies on the following language in the specification:

"To still further provide for the proper operation of the disk under all conditions, I provide a yielding resistance in which are combined the following peculiar conditions: The disk is carried normally without tension; but in the event of foreign matter being introduced between the contacting surfaces of the disk and the cone frusta the disk may lift or vibrate against the yielding; resistance. and be again instantly reset to its proper position as soon as relieved. This is accomplished by simply forming the controlling spindle or axis, 35, of the disk so that its resisting point is near the center of the ball. 60. In this wise the spindle may be made with practical accuracy and of considerable rigidity, so as to control the motion of the disk properly without subjecting it to spring tension; but upon the introduction of foreign material it will yield readily, acting as a spring, for the reason that a very considerable amount of motion at the periphery of the ball or disk will involve but a very slight amount of motion upon the yielding section of the spindle. I provide for the positive control and motion of the disk by mounting upon the end of the said spindle a friction roller, 36."

Counsel for complainant says:

"It is evident that Thomson thought that restraining device of importance solely with regard to foreign solid matter in the meter. He practically says that he so constructs the restraining device that normally it will not be under tension at all, and whenever any piece of solid matter may be carried into the meter chamber under the piston, so that it would, but for the yielding of the piston away from its seat, obstruct the meter by causing the stoppage of the piston, this yielding restraining device, in the nature of a spring, permits the piston to move, and will restore the piston to its normal position, where again it may be controlled or held upon its seat by any other means which may be in the meter, and, as we contend, by means of the greater area and circumfer-

ential extent of the inlet port as compared with the outlet port. That is all there was of it."

Complainant further argues that:

"There is no reason to say that Thomson was trying to improve on those that had the largest possible maximum area, and make one still larger. He does not say so."

(5) Counsel for complainant further invokes the application of the doctrine that an inventor is entitled to all the beneficial uses of his invention, although not disclosed by him in his patent.

As to the foregoing contentions, defendant says as follows:

As to 1: Nine-tenths of said patent and 14 of its 17 claims are devoted to the adaptation of "this type of meter, to be operated with its disk in a vertical instead of a horizontal position," and to provide a certain kind of strainer, registering apparatus, and pressure caps, none of which matters are involved herein. In the remainder of said patent he specifically described and claimed the idea of increasing the size of the inlet port by shifting the diaphragm around into the inlet port, so as to further reduce impact, and providing certain corners so as to prevent leakage; and there is no language in the patent or claims which refers to or suggests any such construction as is contended for by complainant. The theory of the Thomson invention stated by counsel for complainant is one invented by him, and is not supported by the evidence of his experts or by the record. Complainant's expert Foster says he understands said second claim as "limited to a structure in which the velocity of the inlet current is reduced below what it would be in the structure of the said patent, if the diaphragm were set so as to divide the inlet and outlet ports into apertures of the same circumferential extent and capacity." Again he says:

"A mere reduction of the outlet port, providing it was not made smaller than the cross-sectional area of the measuring chamber, would not in any way vary the action of the disk; and, if such was the case, such reduction would be immaterial, and not bring the construction within the invention of the second claim of the patent in suit."

As to complainant's theory that the invention covered by the second claim is the reduction of the size of the outlet port relatively to that of the inlet port, Mr. Benjamin, complainant's other expert, says:

"The patentee does not diminish the size of the outlet port. It would be absurd to do so."

As to 2: There is nothing in the patent to justify the inference attempted to be drawn by complainant as to its second point. "The fourth object of the invention" is, as stated in the portions of the specification already quoted, "to provide the greatest possible area for the inlet of the fluid * * * by extending the line of change from the center of the diaphragm around into the inlet port [that is, shifting the diaphragm into the outlet port], * * * thereby adapting a smaller size of meter than heretofore to greater duty."

As to 3 and 4: The cutting down of the outlet port without shifting the diaphragm, which complainant claims is covered by said claim, would not adapt a small meter to greater duty, but would frustrate this stated object. The patentee explains "the advantage

of this construction, * * *" because "the area of the port may equal or even exceed the area of the passage through the disk chamber." The contention of counsel for defendant is that the construction covered by said second claim does not consist merely in diminishing the outlet port, as already explained, or in making the inlet port relatively larger than the outlet port, whereby impact is decreased. They contend that it covers a construction wherein "the impact of the inflowing current upon the disk is decreased, substantially as set forth"; that is, by adding to the inlet port what you have taken from the outlet port by shifting the diaphragm as specifically described in the specification. They further contend that the second claim covers a construction wherein the inlet port is larger than in prior structures, and that, if it merely covers a construction in which the outlet port is smaller than in prior structures, it is anticipated. As to complainant's contention that said claim must be construed to broadly cover any construction of inlet port greater than outlet port, defendant says that, if so construed, it is anticipated by Thomson & Lambert, Donkin & Fary, and other prior publications. As to the contention that Thomson was not trying to cover in the second claim a still larger port than those of the prior art, and does not say so, defendant says the patent shows the contrary, because it says the "object is to provide the greatest possible area for the inlet of the fluid. * * * The advantage of this construction [the shifted diaphragm, which made a larger inlet than ever before] is that the velocity of the inlet current upon the disk may thus be reduced to the greatest possible extent." And the claim covers such a construction, "whereby the impact of the inflowing current upon the disk is decreased, substantially as set forth." Complainant's expert Foster admits that said claim is limited to a meter in which the impact is less than it was in the prior Thomson & Lambert patent. The earlier Nash patent intimates that outlet ports may be made smaller than inlet ports, and other patents show such a construction in the analogous art of steam engines. The portion of the patent in suit relating to this subject, taken as a whole, seems to support defendant's contention that Thomson's theory was that the impact of the water was the cause of the breaking of contact, and that the impact should be decreased by enlarging the size of the inlet port. The defendant denies that the claim in suit covers a construction whereby the end of the outlet port is diminished and the diaphragm is not shifted, for the further following reasons, inter alia:

(1) The specification describes only one construction, namely, with a shifted diaphragm, and no other construction is anywhere suggested unless it can be guessed at from the general language already quoted.

(2) Thomson, the patentee, testifies that the first and only model constructed was "made by taking one of the [Thomson & Lambert] meters, * * * removing the diaphragm from its regular position, and shifting it round to such an approximate position as is shown in the drawings of the patent."

(3) Thomson did not conceive of or invent a construction whereby the piston was held down on its seat by pressure of the water, and

the relative areas of inlet and outlet have nothing to do with this holding-down effect. This claim that the patentee did not invent a device whereby the piston was kept on its seat by water pressure is supported by the fact that the patent nowhere makes any such assertion, though the patentee repeatedly says that the disk is kept on its seat by means of the spindle, which was the construction of the prior art, by the specification and drawings which describe and show rollers as a mechanical restraint, and from the conduct of the complainant corporation, as shown by the following testimony of its president:

"21. ×Q. What was your object in making up and assembling six experimental meters, when one would have answered the purpose? A. Experiments on those meters had been carried on for quite some time. We were then using in our experiments the regular disk chamber, and were making little patching around the port, with added pieces of brass soldered thereon for the purpose, until we were practically satisfied. Then we had a special pattern made and sent to the foundry, and finished up six meters, so as to find out if the pattern was correct. We thought and still think safer to make an experiment on a few meters at a time, preferably, than in a single one, where the experiment may be deceitful. 24. ×Q. In your answer to ×Q. 21 you say that before you had patterns made you conducted experiments on your regular disk chamber by soldering pieces of brass around the ports for the purpose. What purpose did you have in view in making those experiments? A. To have the disk self-controlled by the action of the current, without any rigid control. 27. ×Q. How long a time did these experiments extend over before the patterns were made from which the castings of this exhibit were made? A. The experiments were made as late as 1888, at the time of our making our upright meter, but were abandoned on account of the illness of Mr. Thomson, the patentee of the patent in suit. 28. ×Q. How long a time was occupied by the experiments referred to in your answer to ×Q. 21,—those which immediately preceded the making of the patterns for the exhibit referred to? A. In 1893 we changed somewhat the style of our meter, to make the meter commercially known as the 'Bee Meter.' Those experiments had to be stopped on account of the illness of myself. Preferably to putting on the market a meter which had not been fully tested, I gave the order to the foreman of the factory to not introduce any change in the port of the chamber until we had had fuller opportunity to decide on this experiment about the ports. In 1894 those experiments were started again, and we found quite a trouble to find a way to tell what was going on in the meter. It is not until the middle of the year 1895 that I designed a special recording device, showing exactly what was going on in the meter when tested. From that time we satisfied our mind promptly how the ports ought to be formed and proportioned to get the self-control of the disk by the current without any rigid control."

(4) It further appears, from the testimony of the inventor himself, that he never tried his invention, except in a pail of water, and under such conditions as made it impossible for him to determine whether the impact of the water did keep the disk on its seat. As to the language quoted above as to mechanical "restraint," defendant says:

"The patentee substituted for the old rigid spindle one with 'considerable rigidity,' which ordinarily controls the disk as in the prior art, without subjecting it to spring tension except on extraordinary occasions."

This will be further referred to in connection with the discussion of the models and expert testimony.

A thorough examination of the testimony, and careful consideration of the exhaustive arguments and briefs, compel the conclusion

that, whatever the patentee may have invented, he did not invent means for keeping the piston on its seat by a change in the pressure of the water. This point will be further considered in the other case.

(5) Furthermore, that, the parties being rivals in business, the complainant, although it made and sold 65,000 disk meters, never made a meter in accordance with the specifications of the patent in suit until long after the issuance of the defendant's Nash patent, and until after the defendant brought out its patented meter, and that from the date of the patent, in 1888, down to 1895, the complainant did not construct or use the port improvement which it now claims is covered by said second claim, and which defendant herein first constructed, and which it (defendant) claims in its other suit against this complainant was first invented by Nash.

It is strenuously contended that in these circumstances the patent in suit, as far as the invention of claim 2 is concerned, is a mere paper patent. The parties are further at issue upon the questions of corners, tight fit, and leakage, as bearing on this contention that the invention covered by the second claim was an impracticable one. The patentee says in the portion of the specification already quoted that to carry out the idea of the reduction of velocity by shifted diaphragm construction, and at the same time prevent communication from one side to the other at the time of change, it is necessary to form the corners, 27, 28, of the outlet port somewhat higher than that of the corresponding corners of the inlet port, and also that the contact of the disk upon the diaphragm shall be made with approximate accuracy. That is, the patentee states that higher corners and a tight fit are essential to secure these two objects,—enlargement of inlet port and avoidance of leakage. Complainant's position on this point is as follows: (a) The patentee is here discussing only the preferred form construction of shifted diaphragm, not the other form of unshifted diaphragm and partially filled up outlet port. (b) Claim 2 says nothing about corners, and refers only to the undisclosed and not preferred form, in which corners would not be necessary. (c) The drawings of the patent in suit and the prior art show constructions in which the piston does not fit tight. (d) A certain amount of leakage was permissible. Therefore a tight fit and corners are only necessary where leakage is to be absolutely prevented. (e) "A loose fit of Thomson's piston, so as to provide the old expedient of equalization of pressure when excessive upon opposite sides of the piston, would have made" the Thomson meter an operative meter. It is admitted that a Thomson meter constructed exactly according to Thomson's specification will not keep its seat, and that a Thomson meter so modified as not to have a tight fit, but to permit leakage, will keep its seat. But the contention that such leakage is permissible is not proved. That the patent does not describe a loose-fitting piston appears from the foregoing and following quotations from the specifications:

"A recess, 41, is first milled into the face of the edge of the disk, very slightly larger in diameter than the roller intended to be used. A pivot bearing is then formed, and preferably of a depth several times greater than the length of the roller intended to be used. The roller is then placed to position, and

the pivot, 42, forced in; the bearing through the roller being a snug fit, while the bearing in the disk is free. Now, by slightly relieving the edge of the slot, it will be seen that the entire thrust upon the diaphragm is borne by the friction roller, and that in consequence of causing the pivot to turn with the roller a bearing of ample extent may thus be obtained."

That is, the roller is inserted so as to fit closely to the diaphragm, and the "slightly relieving the edge of the slot" is not sufficient to make a port which would be material in view of water packing. This will be referred to again in connection with the discussion of the models. Inasmuch as the patentee says that corners and a tight fit are "necessary," they must be read into the claim as essential parts of the patented construction.

As to complainant's contention that corners and approximate accuracy of contact of the disk upon the diaphragm stated by the patentee to be necessary are conditions only of the preferred, and not of the undisclosed, form, it must be held that Thomson never conceived of any such undisclosed form. Taking the whole case together, the contentions of defendant already stated are sustained by the patent, in connection with the other evidence. The unsolved problem in this art was how to utilize water pressure alone to keep a meter on its seat. Thomson invented a way to reduce impact,—a means to an end. But he did not say or show or illustrate how water kept the piston on the seat. He did not experiment to find out. The device constructed according to his specifications is unpractical and was never used. If now, by a modification of this construction not hinted at in said specification, the new and unexpected result is accomplished which complainant had vainly sought for seven years, it is persuasive evidence of a new and independent invention. Especially is this so in the light of the evidence in the other case, where this defendant is complainant, and where it appears that a practical meter in which water did keep the piston on its seat was patented by the defendant Nash and manufactured by the defendant herein before this complainant had ever made a practical meter in which the piston was kept on its seat by water pressure alone.

The efforts of experts and counsel, so far as models are concerned, have been chiefly directed to the question of whether the specifications and drawings of the patent in suit showed an operative meter; that is, one in which the piston would hold its seat without mechanical restraint. In support of the negative of this contention, defendant produced what is known as the "Carlile Model,"—a meter constructed in exact accordance with the specifications of the patent. Thomson, the patentee, says it "is as precise a production in metal of the drawing in the patent as might be expected from illustrations of such character and the specification, * * *" and "is such a construction as is precisely illustrated in the patent, and which I would expect a skilled mechanic to produce if ordered to follow the lines." It is admitted by complainant's expert that it will not work, and in fact it is proved that such a meter keeps its seat better and works better when run backward than forward, because the raised corners of the outlet port and the tight fit between piston and diaphragm cause a pocketing of the water, which forces the piston from its seat. Com-

plainant criticises this model, because Carlie, the maker, was not a meter constructor, and because it does not literally follow the dimensions of, and is slightly larger than, the patent drawing. It appears, also, that, while Thomson is a competitor of both parties herein, he was not particularly friendly to defendant, and was called as a witness by complainant. But it does not appear that Thomson was an unfair witness. He expressly refused to testify as an expert for defendant. And it does not appear that the failure to "literally follow the dimensions" affected the result. And it does appear that complainant's models, except where the construction departed from the specifications of the patent, did not operate. The claim that the inventor is entitled to the beneficial uses of his invention should not be extended so as to embrace an independent invention. The only foundation for the claim that Thomson conceived the practical construction as now interpreted is the omission from the second claim of the statement concerning the shifted diaphragm. This construction is utterly unsupported by the specification. The omission of the patentee to point out the special feature which he subsequently maintains is the most important part of his invention is very significant in this connection. MacColl v. Loom Works, 37 C. C. A. 346, 95 Fed. 982. Therefore, if those essentials to this construction which it is alleged Thomson invented must be read into the specification in order to make an operative meter, this makes a new construction,—one which involves invention, and of which Nash claimed to be the inventor, and which complainant did not make till after Nash had published his invention. If it were necessary to the decision of this case, I should be constrained to hold that the modifications now thus introduced to produce a meter whose piston kept its seat by water pressure were so radical, and their effect so unexpected until after defendant produced its patented meter, that they amounted to invention, and could not be embraced within the scope of the invention as stated and described by the patentee. If the preferred form of meter described in the patent did not operate without mechanical restraint or an impracticable amount of leakage, and if it was necessary to the operativeness of the undisclosed form of the invention to leave the diaphragm in the center, to fill up the end of the outlet port, to dispense with the corners, and to borrow a loose-fitting piston or one with ports from the prior art, the expected skill of the ordinary mechanic could not be supposed to supply all these essentials.

It is unnecessary to discuss the contentions as to anticipation by the Donkin & Fary patent, or as to areas. Both sides agree that area in the patent generally means "effective area," and that when Thomson referred to the ports of "equal area" of the prior art he meant that feature of construction of the so-called equal areas of Thomson & Lambert and Nash, which consisted in having the largest possible outward or measured areas equally disposed on either side of the diaphragm. Counsel, experts, and patentees have used these words in different senses, and have adopted different standards of measurement, based on water flow, the size of the hole alone through the skin or inner surface of the meter, or the size of the hole and grooved passage leading thereto, taken together. One of the experts

for complainant, being referred on cross-examination to the testimony of the other expert for complainant as to the meaning of the term "area" and of the terms of the claim in suit, said, "I have not construed them so, and I do not construe them so." The defendant's contention that the size of the outlet port has no effect on the impact was practically admitted by complainant on final argument. All the experts except Mr. Benjamin agree that the words in the claim in suit "whereby the impact of the inflowing current upon the disk is decreased" mean that the impact in the Thomson meter is less than that in the prior Thomson & Lambert meter. Mr. Benjamin practically contends that these words must be eliminated from the claim. If the former meaning be adopted, the defendant's construction does not infringe; for it increases impact, as compared with Thomson & Lambert. The construction contended for by Mr. Benjamin cannot be adopted, because, as a matter of law, it is settled that such a specific statement of function thus inserted into a claim as material cannot be disregarded.

In Computing Scale Co. v. Keystone Store-Service Co. (C. C.) 88 Fed. 788, the claim was for a certain combination "whereby the pivotal supports of the beam and rod, e, may be brought into alignment, as and for the purpose described." The court held that this covered only such a combination so constructed that the supports might be brought into alignment as and for the purpose described, and said:

"The insertion of these words meant something, and they must be given due weight. The construction we adopt accords them meaning. That of complainant ignores their presence, and makes nonessential what the patentee and the office have deemed material and essential."

In Renwick v. Pond, 20 Fed. Cas. 536, Judge Blatchford said that where a combination was claimed, so arranged as to effect a certain engagement "if the combination exists, yet, if it is not so arranged as to effect such engagement, there is no infringement." See, also, Lovell v. Johnson, 33 C. C. A. 426, 91 Fed. 160; J. L. Owens Co. v. Bradley (C. C.) 83 Fed. 482; Roemer v. Peddie, 26 C. C. A. 440, 81 Fed. 380; Whitaker Cement Co. v. Huntington Dry Pulverizer Co., 37 C. C. A. 151, 95 Fed. 471.

The defendant does not infringe the shifted diaphragm or preferred form construction of the patent in suit. It makes an efficient meter, in which the actual area of its inlet port is not of "the greatest possible area," as in Thomson; is not so large as the inlet ports of the prior art. The actual area of its inlet port is greater than the areas of its outlet ports. As to whether the effective area is greater or not, complainant's experts differ. The following arrangement in parallel columns, taken from defendant's brief, correctly states the relations of the two constructions:

### Summary.

Specifications and Claims of Thomson Patent in Suit Compared with Nash Meter.

Page 1, line 62:

| | |
|---|---|
| "The fourth object of the invention is to provide the greatest possible area for the inlet of the fluid to the disk chamber, thereby adapting a smaller size of meter than heretofore to greater duty." | The area of the inlet of the Nash meter is not the greatest possible, nor, indeed, as large as in prior meters. |

Page 2, line 15:

"This is accomplished by extending the line of change in the disk from the center of the diaphragm around into the inlet port, as indicated by the broken line, 26.

"To permit such a formation of the inlet port, and at the same time prevent communication from one side to the other at the time of change, it is necessary to form the corners, 27, 28, of the outlet port somewhat higher than that of the corresponding corners of the inlet port, and also that the contact of the disk upon the diaphragm shall be made with approximate accuracy.

"The advantage of this construction is that the velocity of the inlet current upon the disk may thus be reduced to the greatest possible extent, as the area of the port may equal or even exceed the area of the passage through the disk chamber."

Claim 2:

"In a water meter, the combination, with a disk chamber having a fixed diaphragm and an oscillating disk therein, of inlet and outlet ports formed in said chamber, the area and circumferential extent of the inlet port being greater than that of the outlet port, whereby the impact of the inflowing current upon the disk is decreased, substantially as set forth."

This feature is the subject of claim 3, which we are not charged with infringing, because the line of change in the Nash meter is not shifted at all.

The corners of the outlet port of the Nash meter are lower than the corresponding corners of the inlet port.

In the Nash meter there is a large opening in the disk at the side of the diaphragm.

The inlet port of the Nash meter is smaller than inlet ports of the prior art, and the velocity of the inlet current is therefore augmented.

The areas of the inlet and outlet ports of the Nash patent are practically equal.

The impact of the inflowing current in the Nash meter is not decreased, but is increased fourfold.

The construction of defendant's patent will be further discussed in the other suit. The conclusion reached is that defendant does not infringe the second claim of complainant's patent, upon either construction thereof, and the bill may therefore be dismissed.