## NATIONAL METER CO. v. THOMSON METER CO.

(Circuit Court, S. D. New York. October 5, 1900.)

1. PATENTS—VALIDITY—DESCRIPTION OF PRINCIPLE OF OPERATION.

Where a patentee has invented and described a successfully operating machine, which accomplishes the results sought, it is immaterial whether or not his attempted description of the principles by which such results were attained is correct, as the fact that he did not understand the scientific principles of operation does not deprive him of the right to protection.

2. SAME—WATER METERS.

The Nash patent, No. 547,178, for a disk water meter, claim 1, construed, and *held* valid, when limited to substantially the construction shown in the drawings. Claim 3, which covers a nutating piston or disk having ports, *held* void for lack of novelty. Claim 1 also *held* infringed.

3. SAME.

The Nash patent, No. 527,535, for a disk water meter, claims 1 and 2, which relate to the location and shape of the ports in the nutating disk, if broadly construed, were anticipated, and, if narrowly construed, are void for lack of invention.

4. SAME—THREATENED INFRINGEMENT—INJUNCTION.

Where a defendant made patterns and castings therefrom which embodied an infringing device, and assembled six machines, which were placed

in stock, a sufficient intention to infringe is shown to warrant a court in granting an injunction against the threatened infringement.

In Equity. Suit for infringement of patents. On final hearing.

Gifford & Bull and Edmund Wetmore, for complainant.

Edwin H. Brown, for defendant.

TOWNSEND, District Judge. Final hearing on bill and answer raising questions of validity and infringement of the first and third claims of complainant's patent, No. 547,178, granted October 1, 1895, and of the two claims of patent No. 527,535, granted October 16, 1894, to L. H. Nash for improvements in disk water meters. The class of meters to which these patents relate, the construction of the patent under which defendant herein claims to make the meters alleged to infringe, and the relations of the parties hereto have been discussed in the suit of this defendant against this complainant heard at the same session of this court, 106 Fed. 519. All the evidence in said suit has been stipulated into this suit, and many of the questions involved herein were therein discussed and disposed of. The following statement recapitulates some of the facts already found, in connection with other facts bearing directly on the issues herein: The parties are rival water-meter manufacturers. Each of the patentees is an inventor in the same art. Each had made valuable contributions thereto prior to the inventions involved in these suits. The Thomson patent, No. 387,831, the second claim of which was the basis of the other suit, was dated August 14, 1888. Between said date and November 23, 1895, the date of the alleged infringement herein, the Thomson Company sold about 65,000 meters, none of which had ports such as are shown in said Thomson patent, and all of which had ports such as were shown in the prior Thomson & Lambert patent, although during all this time they had been experimenting to find out "how the ports ought to be formed and proportioned to get the self-control of the disk by the current without any rigid control." Prior to this later date, namely, on October 1, 1895, the main Nash patent in suit, No. 547,178, hereinafter to be called "Nash No. 1," was issued to this complainant. That is, nearly two months after the issuance of this Nash No. 1 patent, and over a year after the Nash Company had put on the market a meter built according to its patent, and having its piston held to its seat without mechanical control (being the meter alleged to infringe in the Thomson suit), the Thomson Company first made and sold a meter differing from the old Thomson & Lambert, and so closely resembling the construction of Nash No. 1 that, barring a contention of accidental sale, infringement is practically admitted. In view of the foregoing and other facts, it was held in said other suit that the second claim of the Thomson patent did not cover an operative construction for holding a piston on its seat by water pressure alone. On the argument in this case it was agreed as follows:

"That after the issuance of the Nash patent, and after complainant's meters were put on the market, the changes made by defendant consisted in the construction of ports as in defendant's wide-flange meter No. 3 and Thomson meter No. 4. The changes consisted in opening or enlarging the

port in the piston, and diminishing the outlet port, as indicated, substantially, by line 30, figures 4 and 5, of the Nash patent."

It will be necessary to refer to said patent and exhibits to show the nature of these changes.

Complainant claims that Nash made the brilliant discovery of the principle, and the invention of the means for accomplishing this object, and disclosed it in patent No. 1, and that defendant infringes the first and third claims, which are as follows:

"(1) In a water meter, a nutating piston combined with a measuring chamber and with ports so constructed and proportioned relatively to each other as to constantly maintain a superior resultant pressure opposite the lines of contact between the piston and its cones. (3) In a water meter, a nutating piston provided with a port or ports communicating between the chamber on opposite sides of the piston, combined with ports in the case; said ports being so constructed and proportioned relatively to each other as to constantly maintain a superior resultant pressure opposite the lines of contact between the piston and its cone."

Perhaps the problem which complainant herein claims was presented to Nash prior to 1895 cannot be more forcibly stated than in the language of Mr. Benjamin, the expert for complainant in the Thomson Case, where he was stating the problem which was presented to Thomson prior to 1888. He says:

"The question, therefore, before the inventor is, how can a nutating meter be constructed so that the disk by reason of that construction shall remain balanced in the chamber while constantly maintaining contact with the chamber cones, under all conditions of water supply up to the maximum which the meter will permit to pass, thereby preventing leakage and thereby causing the meter to perform its maximum duty? The patentee of the patent in suit has discovered the answer; and, so far as I know, for the first time in the art he shows that the desired result can be secured by a certain shaping and relative proportioning of the inlet and outlet ports of the meter chamber, so that the apparatus is rendered independent of the force of the water flow, and requires no adjustment and no variation in point of construction with relation thereto, even up to the condition when the maximum possible current enters the inlet port, or, in other words, the meter is rendered always self-balancing by reason of its permanent construction."

Thomson did not solve this problem. Neither he nor any one else even tested his patented construction to see whether it would have this effect until after the issue of the patent in suit. Did Nash solve this problem? In his patent he says:

"One of the principal features of my present invention consists in proportioning either the inlet or outlet, but preferably both the inlet and outlet, ports with relation to the enlarging and contracting measuring chambers with which they communicate, so that the unequal pressures on the opposite surfaces of the piston will automatically develop a force always tending to hold it in joint-forming contact with its case. This may be accomplished in various ways in a structure like that which is illustrated here. I have shown one way which is efficient, and in connection therewith have shown the ports as I at present prefer to make them.

"Figs. 4 and 5 are representations of a measuring chamber with a nutating piston in two different positions, and with inlet and outlet ports in the side walls of maximum capacity. We will assume that the chambers on the right-hand side of the abutment, 21, are the enlarging and receiving chambers, and that those on the left-hand side are the discharging and contracting chambers. 23 and 24 thus show two enlarging chambers, and 25 and 26 two contracting chambers. The edge of the piston separates not only the enlarging chambers, but also defines the limits of the ports leading to each. The ports and the measuring chambers are constantly changing in size as the piston moves. It

will be plain that, if at any position of the piston we subtract the differences of pressure in the two inlet chambers from the differences of pressure in the two outlet chambers, we will determine the resultant force, its amount, and whether it presses the piston against the cones on the line of contact separating the chambers, or lifts it away from contact. Assuming that the piston be in the position shown in Fig. 4, and that the piston is moving in the direction indicated by the arrows, both inlet chambers 23 and 24 are enlarging at a given rate. In the instantaneous position in which it is shown in this figure both chambers have substantially the same rate of increase; but as it moves from this position the rates of increase differ, the chamber 23 progressively enlarging more and more rapidly than the chamber 24. Now, considering only, the enlarging or inlet ports, if the ports through which these chambers are receiving water are in every position of the piston of size exactly proportionate to the rate at which the chambers to which they respectively communicate are enlarging, precisely the same pressure would always be present on both sides of the piston; but if the port supplying water to one of these chambers be, in proportion to the rate of enlargement of its chamber, smaller than the port supplying water to the other chamber, then there will be excessive pressure on that side of the piston which has the relatively larger port open to it. However, this relation between the sizes of the inlet ports itself does not necessarily determine in what direction the piston will be forced, because the resultant and effective force is due not only to the difference between the pressures in the inlet chambers, but involves the consideration of these pressures in connection with the difference of pressures in the outlet chamber. Nevertheless, by ascertaining the rate of enlargement of these inlet chambers at every point during the revolution of the piston, and by proportioning the inlet ports so that one shall have proportionately larger capacity than the other, a force can be here generated constantly operating to press the piston against the cones to maintain the lines of contact; and if this force be not opposed by a force generated in the inlet chambers, or if the force generated there be not great enough to overcome this force generated in the inlet cham-

bers, the piston will be held in contact with the cones. * * * Nevertheless the form and relation of these inlet ports may be so modified that without changing the outlet ports the desired effect may be obtained in all positions of the piston. One method of attaining this result is shown in Fig. 5, in which the dotted lines, 28, 28, indicate the contraction of the inlet port near the diaphragm, an equal amount being taken off both ports. As these ports are already of unequal area, the port of smaller area is thereby made relatively smaller to the rate of enlargement of the chamber to which it leads."

The theory of this operation is explained by the following sketch and illustrations produced by counsel for complainant, and reproduced herein:

Summary of Instructions of Nash Patent.

How to obtain holding-down effect in every instantaneous position of the piston:

To obtain holding-down effect, the sum of the pressures in the two chambers opposite the lines of contact must be greater than the sum of the pressures in the two chambers on the same sides as the lines of contact; i. e. sum of A and D greater than B and C.

Let A have 4 units of pressure. | Let A have 3 units of pressure.
B " 2 " " " | B " 3 " " "
C " 3 " " " | C " 4 " " "
D " 3 " " " | D " 2 " "
Pressures A + D > B + C. | Pressures B + C > A + D.
4 + 3 > 2 + 3 = | 3 + 4 > 3 + 2 =
2 units holding-down pressure. | 2 units holding-down pressure.

Certain experiments with an ordinary syringe on the hearing illustrate the following propositions:

Proposition 1. Increasing size of port to enlarging chamber increases pressure.

Proposition 2. Diminishing size of port to enlarging chamber decreases pressure.

Proposition 3. Diminishing size of port to contracting chamber increases pressure.

Proposition 4. Increasing size of port to contracting chamber decreases pressure.

There will be no resultant pressure in either direction if—

Rate of change of A : Rate of change of B : : Area of port to A : Area of port to B.

And

Rate of change of C : Rate of change of D : : Area of port to C : Area of port to D.

But a holding-down effect may be obtained by—

(1) Increasing area of port to A (see proposition 1); or by
(2) Diminishing "   "   "   " B (see proposition 2); or by
(3)         "   "   "   "   " D (see proposition 3); or by
(4) Increasing   "   "   "   " C (see proposition 4).

It may be assumed that these statements are correct, in so far as they set forth certain well-recognized theories in hydraulics. It does not appear that their general correctness is disputed. And, even if they were not correct, it would perhaps be immaterial, provided Nash first told the world how to make the ideal meter.

Counsel for defendant argues as follows:

(1) It does not satisfactorily appear wherein this Nash meter and the old Nash meter of patent No. 379,805 differ, except in "a difference consisting of greater area and greater circumferential extent in the inlet port as compared with the aggregate outlet ports."

(2) The patentee repeatedly refers in the specification to the effect of his port construction, so that the force or pressure will "always" or "constantly" or "at every point" control the operation of the piston, or hold it in joint-forming contact with its case.

(3) As no new form of port is shown, Nash has merely patented a principle, but has devised no new construction. But this alleged constant control is impossible, because there is only a fraction of the time when the piston and ports coact.

(4) There is no proof that "the form and relation of these inlet ports may be so modified that without changing the outlet ports the desired effect may be obtained in all positions of the piston," and no such construction is found in complainant's meter, except in connection with other constructions.

(5) Figs. 4 and 5 of the patent, especially in view of the modification suggested by line 30, are within the Thomson patent, because they show a shortened end of the outlet port, and corners or equalizing ports are as necessary as in Thomson.

(6) As to conflicting theories of "what happens in these meters, nothing more is known except that there is some sort of a disturbing effect by the water on the piston where the ports are of equal size." One says it is impact. The other says it is proportion of hydrostatic pressure.

The answers of complainant to these contentions are:

As to 2: That, while neither specifications nor claims of the patent say anything about constant control of ports, the ports may be so constructed that there shall be constant coaction between them and the piston.

As to 4: That there is no proof to contradict the quoted statement "that the form and relation of these inlet ports may be so modified * * * that the desired effect may be obtained," etc. Complainant is correct on this point. It contends that the holding-down effect is not due to the relation between the areas of the ports. It supported this contention by various illustrative models and tests. On cross-examination defendant did not attempt to show wherein certain of these tests claimed to support the above statement of the patent and the contentions founded thereon were incorrect.

As to 5: Figs. 4 and 5 are not within the Thomson patent. If the decision in the other case is right, complainant is correct on this point.

As to 1, 3, 6: It may be that defendant's first contention is true. But it does not appear that complainant has appropriated Thomson's invention, as it has been defined in the Thomson suit, or that in using its ports it has appropriated any feature of Thomson's invention which is shown to be useful or practicable. It is not satisfactorily shown whether this patent does or does not state a theory correct enough as a matter of hydraulics, but incorrect as a disclosure of the efficient cause of its successful practical operation in keeping the piston on its seat.

With this piston nutating 20 times in a second; with experts and counsel hopelessly at variance as to the principles of the operation of the water; with such a close resemblance between the construction of the unsuccessful and successful devices that the differences can only be kept in mind by having the two devices before one's eyes, marked with different colored tags; with the admitted fact that defendant's noninfringing meter will keep its seat provided it is permitted to leak,—it cannot be found that the complainant herein has proved that the piston of his meter keeps its seat because of the theory stated in his patent. We have here the case of two rival inventors presented with the problems stated at the commencement of this discussion. They attacked these problems on different theories and provided different constructions for the purpose of remedying the prior defects. Thomson's theory was that the piston was forced from its seat by the impact of the water; that this could be "decreased" beyond anything previously known by "the greatest possible area for the inlet." His idea of shifted diaphragm involved a novel conception. If it were not for the necessary corners or impracticable leakage, it seems as though it might have solved the problem. That it did not solve it has been already decided in the former case. Nash's stated theory is that proportioning of pressures will keep the piston on its seat; that this may be secured by having the port so constructed that it shall "constantly maintain a superior resultant pressure opposite the lines of contact between the piston and its cone"; that this does not result "from the absolute position, size, or function of either of these ports, but that it is dependent upon the relative shape, size, and function of all the ports taken together"; that it does not depend upon any particular shape or location of any particular port, or from any definite relation of size between the ports as constructed in the case, but that the various parts of the ports as they are successively brought into action by the motions of the piston should have a definite relation to the varying dimensions or the varying capacities of the chambers. The decision of this case does not finally rest on Nash's theory, or on the question of its correctness, or on the claim that he patented a principle. It is true that the statute provides, "in case of a machine, he shall explain the principle thereof, and the best mode in which he has contemplated applying that principle," etc. But as Mr. Walker says in his work on Patents (section 115):

"The first provision cannot mean that the inventor must infallibly explain the law of nature which makes his machine work; for, if it means that, neither Morse nor Bell complied with it when describing the telegraph or telephone. * * * The first provision means that the essential distinctive characteristic of the machine shall be explained."

The inventor is entitled to all the beneficial uses of his invention which are sufficiently pointed out and described. If such description of means be sufficient to confer upon the public the beneficial result, it is immaterial whether or not the inventor understood the scientific principle of its operation. The evidence herein shows that Nash introduced into the construction of his meter a change of form essential to successful operation. Therefore he should not be deprived of the fruits of his invention merely because he may have mistaken the philosophical theory of its operation. As counsel for defendant herein stated in his brief when arguing the other case as complainant:

"Theories of the modus operandi are of no value to the users of a meter, especially as in the development of every art they change from time to time. The important consideration is the result attained, and not how the result is attained."

In Dixon-Woods Co. v. Pfeifer, 5 C. C. A. 148, 55 Fed. 390, the patentee "simply told him to construct a machine which carried the glass through the leer on a level, and saved much breakage." Judge Shipman, delivering the opinion of the court of appeals, said:

"The specification closely and altogether too closely adheres to mere mechanical features, and creates doubt as to whether Tondeur thoroughly understood his invention. It indicates that the patentee did not understand the philosophical principles which caused the mechanism to produce an improved annealing. * * * He meant to instruct the public that glass was to be carried through the tunnel on a level, though he might not have known why it was so conveyed. * * * The patentee told the trade of which he was a member by what mechanical means breakage of glass in the process of annealing could be saved; in other words, how to anneal glass better and more economically. His patent described clearly enough the way in which bars and the operative mechanism should be constructed and operated, and the glass should be conveyed through the leer. He did not know, or he did not tell, why the new method would produce better results. * * * He ought not to lose the statutory benefits which would certainly belong to him if he had seen and described the philosophy of his machine accurately."

In the case at bar it is conceded that the patentee described a successfully working meter, in which the piston was kept on its seat by means of water pressure, without the use of a restraining device. It is therefore immaterial whether his attempted description of the principles by which said results were attained was or was not correct. Coralline Co. v. Dorr (C. C.) 46 Fed. 773; Dixon-Woods Co. v. Pfeifer, supra; Knickerbocker Co. v. Rogers (C. C.) 61 Fed. 299; Walk. Pat. § 175. It is conceivable that when Nash first constructed a working meter he may not have understood why it kept its seat; that he may have hesitated between the theories of impact and proportion; that he may have felt a doubt as to his right to assume that this result was due to the relation of outlet to inlet port, or may have thought that both theories were in some sense involved in the operation of his meter. He may have hesitated to adopt the theory now advanced by complainant in the fear that Thomson might be extended to cover

such construction. In the case at bar, upon the whole evidence, it is clear, as stated by counsel for complainant—

"That Nash first made ports holding the piston down; and it is certain that ports made on the lines he prescribed do hold the piston down, and that every meter in which the piston is held down (including the Thomson infringing meter) has ports made substantially as Nash directs."

Counsel for defendant says:

"There is not a single meter that has ever been commercially made, nor any meter completely illustrated in any patent before your honor, of which it is said that the piston will be held to its seat by port construction, except where the port construction involves such a feature of greater area and greater circumferential extent than the inlet port."

Even if this statement be accepted as true, and even if it be also admitted that Thomson's second claim might have been construed to cover such a construction without shifting the diaphragm, if he had been successful in making a practical meter, yet inasmuch as Nash, and not Thomson, first produced a meter which kept its seat by water pressure only, Nash should be held to be the real inventor.

There is much force in the argument of counsel for defendant that this first claim is for any means which will produce the desired result. It is, of course, evident that, in order to prevent by water pressure a nutating piston from breaking contact, there must be constantly maintained "a superior resultant pressure opposite the lines of contact between the piston and its cones." The claim may therefore be said to broadly cover any construction of ports which will accomplish the object sought. The defendant may be correct in saying that, aside from the drawings, no instructions are given to aid a skilled mechanic in the construction of the ports. After a careful and thorough consideration of the arguments, briefs, and evidence, it remains very doubtful whether some of the contentions of the defendant are not correct, and whether the patent ought to be sustained, and the conclusions above stated have been reached with much hesitation. Inasmuch, however, as the complainant seems to have found one successful construction, and the defendant, after years of effort, has been successful only when it adopted substantially the same construction, and as the case ought, in any event, to go to the court of appeals, and the patent office has found that there is a patentable invention and that it is properly described and claimed, the decision of the patent office will be followed in so far as to hold the first claim valid when limited to substantially the construction shown in the drawings of the patent, which is found to be the only construction intelligibly pointed out which is proved to accomplish the object sought, and which defendant has imitated.

The foregoing conclusions relate to the first claim in suit. The second claim covers the construction of the first claim, with the added limitation that the nutating piston shall be "provided with a port or ports communicating between the chamber on opposite sides of the piston." These ports are entirely distinct from the inlet and outlet ports. Their construction and method of operation are shown by the following quotation from the patent:

"In the meter illustrated in the accompanying drawings I have formed ports in the piston where it is slit to straddle the abutment, which ports com-

municate on one side of the abutment between the inlet chambers above and below the piston, and on the other side between the outlet chambers above and below the piston. Water will flow through these ports whenever there is a difference of pressure in the chambers on opposite sides of the piston, thus tending to equalize the pressure in the opposing chambers."

These ports were not essential to the operativeness of the meter, but they were helpful in equalizing pressure. Counsel for complainant in their brief truly say as follows:

"Piston ports are not new. They are shown and described in the earlier Nash patent, No. 379,805. They are not claimed as new in the Nash patent No. 1, but only in combination. In the earlier Nash patent, however, they were employed to neutralize pressures which forced the piston off its seat, while in Nash patent No. 1 they are used to diminish pressures which hold it on its seat."

Complainant's expert admits that Nash himself had shown in his earlier patent "a nutating piston with ports substantially like those of the patent in suit." These old ports, therefore, were employed to perform the same function in each case. The advantages resulting from their use in the later patent are at best only the secondary results attained from an analogous use. Such result being "the same in character as the original result, it will not be deemed a new result for this purpose." Blake v. City and County of San Francisco, 113 U. S. 679, 5 Sup. Ct. 692, 28 L. Ed. 1070. "It is only the occasion which is new. The use itself is merely analogous." Heald v. Rice, 104 U. S. 754, 26 L. Ed. 910.

The two claims of patent No. 527,535, called "Nash Patent No. 2," are as follows:

"(1) In a water meter, the combination, with a suitable case, of a piston having a motion of nutation, and a port extending to the rim of the piston, establishing communication between chambers on opposite sides of the piston. (2) In a water meter, the combination, with a suitable case, of a piston having a motion of nutation, a port extending to the rim of the piston, establishing communication between chambers on opposite sides of the piston, and a bearing surface near the ball therefor."

The construction covered by these claims is a very simple modification of the ordinary construction. The ports in the pistons of the prior art were generally located near the ball or bearing of the piston. Nash shifted them away from the ball and located them near the rim of the piston. By this construction he claimed to have secured these advantages: (1) "The minimum width of the port may be obtained for a given capacity," so as to reduce leakage. (2) "The life of the piston is increased, and the liability of breaking diminished," as "the piston is in frictional contact with the abutment only towards the ball, where it is strongest and where the leverage is least." (3) "By cutting the piston away at this point any particles of matter lodging there will not interfere with the operation of the meter." It will be assumed that by this construction these advantages were secured. The expert for complainant herein has admitted that one of the slits in the piston straddling the diaphragm, namely, that shown in the prior Davies patent, No. 384,024, of 1888, was greater than a passage which in the other suit he had declared was a port. Counsel for complainant herein contend that the slits of the prior art were not ports, because "in not one of the patents or publications alleged by

the defendant to contain ports extending to the rim of the piston is there shown a slot of greater width than is necessary to enable the disk to operate." This contention is not satisfactorily proved.

The first claim in suit broadly covers any piston port of any shape extending to the rim of the piston, and "establishing communication between chambers on opposite sides of the piston." In the analogous Taylor & Davies British patent of 1836, the patentee says:

"The disk or plate, E, has a part cut out of it, forming a slot as at b, b (see Fig. 7), for the purpose of allowing the piston, D, to pass through it, and the steam to enter into and escape from both sides of the disk."

This port, although narrower near the periphery of the piston, extends to its rim. It is unnecessary to differentiate the two claims. It is also unnecessary to discuss the other patents, or the conflicting claims as to certain alleged anticipations. The patent, if construed broadly, is anticipated.

As to the second claim: If the patent can be narrowly construed, the following questions arise: Did it involve invention to shift a slot away from the center towards the periphery merely in order to apply the law that "to obtain a given area in a segment of a small nick it is necessary to make the segment have a wide angle"? The practical effect of water packing and leakage had been fully discussed by Thomson & Lambert. Did it involve invention to put a slot in that part of the rubber disk where it was less likely to break or to catch foreign substances? Did it involve invention to so chamfer out the slots of the prior art—a confessedly common expedient—that it might at the same time serve to permit the disk to nutate and water to pass through? These questions must be answered in the negative.

A technical claim of noninfringement is stated by counsel for defendant as follows:

"One defense to the National Company's suit on patents Nos. 547,178 and 527,535 is failure of the National Company to prove that any meter answering the terms of said patents was ever made by the Thomson Company, except for purposes of experimentation, or ever sold, with the exception of one that was sold by mistake to the National Company."

The direct testimony of the president of the defendant company on this point shows that:

"This meter belonged to a lot of six meters which were assembled for test purposes. The other five were afterwards taken apart. That meter (72,331) was accidentally delivered by myself to bearer sent to our factory by National Meter Co. with the order to take a meter with him,"—and that "that is the only meter they sold of that kind."

On cross-examination he testified that these six meters were the ones subjected to the tests explained in a portion of his testimony already quoted in support of the conclusion that the Thomson Company at the date of the Nash patent were still experimenting in order to solve the problem of a practically successful meter. The defendant contends that the sale of this meter is not an infringement, because the sale was accidental, it was made to the patentee of the patent in suit, and it was not employed for beneficial uses of a pecuniary character. It is unnecessary to discuss these questions. Even if such a sale does not constitute infringement, the evidence shows a threat-

ened infringement by complainant's rival in business. It is not contended that these meters were made for amusement or for "gratifying a philosophical taste." Poppenhusen v. Falke, 4 Blatchf. 495, Fed. Cas. No. 11,279. The defendant confessedly "finished up six meters so as to find out if the pattern was correct," which pattern was the subject of experiment "to have the disk self-controlled by the action of the current without any rigid control." The character of the tests, the making of patterns and castings therefrom embodying the infringing port construction, the assembling of the parts, and the completion of six meters and placing them in stock, sufficiently show an intention to infringe. In such circumstances it is well settled that the court may protect the complainant against intended infringement by injunction. Rob. Pat. § 1191; Woodworth v. Stone, 3 Story, 749, 752, Fed. Cas. No. 18,021; Fence Co. v. Land (C. C.) 49 Fed. 936, 937; Whittemore v. Cutter, 29 Fed. Cas. 1120, 1121; Machine Co. v. Underwood (C. C.) 73 Fed. 206, 211; New York Belting & Packing Co. v. Gutta-Percha & Rubber Mfg. Co. (C. C.) 56 Fed. 264; Electrical Works v. Henzel (C. C.) 48 Fed. 375–377; Winchester Repeating Arms Co. v. American Buckle & Cartridge Co. (C. C.) 54 Fed. 703, 711; Spindle Co. v. Turner (C. C.) 55 Fed. 979, 980; White v. Walbridge (C. C.) 46 Fed. 526. Furthermore, this point was not pressed on the argument. The other questions were exhaustively discussed, and all the counsel united in the request that the case might be disposed of on the merits. A decree may be entered for complainant for an injunction and an accounting as to the first claim of patent No. 547,178. As to the third claim of said patent, and as to both claims of patent No. 527,535, the bill may be dismissed; no costs to be taxed by either party.